IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| DUNDEE CONCRETE AND LANDSCAPING LLC, a Washington limited liability company, | ) ) ) ) | No. 41259-8-III |
| Respondent, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| LT REAL ESTATE LLC, a Washington limited liability company; LT LANDSCAPING LLC, a Washington limited liability company; LT PROPERTY MANAGEMENT LLC, a Washington limited liability company; and LT CONTRACTOR LLC, a Washington limited liability company, | ) ) ) ) ) ) ) ) ) ) | |
| Appellants. | ) ) | |

LAWRENCE-BERREY, J. — The LT entities appeal the trial court's summary

judgment order, which concluded that the entities were liable to Dundee Concrete and

Landscaping LLC for the nonpayment of several invoices for snow and ice removal.

We affirm.

FACTS

In 2018, Dallas Lightner and Ryan Towner started several real estate companies: LT Real Estate LLC; LT Landscaping LLC; LT Contractor LLC; and LT Property Management LLC.[1]  The names of these entities described the services each provided; for example, LT Landscaping offered landscaping services for residential and commercial rental properties.  Each LT company is organized as a separate and distinct legal entity.

In February 2023, LT Landscaping hired Annie Prescott to be its office manager.  Ms. Prescott performed her duties under the close supervision of Mr. Lighter and Mr. Towner.  Ms. Prescott's duties included "calling vendors for pricing and availability," "drafting estimates," and proactively managing procedures to mitigate projects.  Clerk's Papers (CP) at 67.  Ms. Prescott's e-mail signature gave her title as "Landscaping Officer Manager," and the letters "LT" appeared in large type under a headshot photograph of her.  CP at 45.  This information was included in every e-mail sent by Ms. Prescott.

In August 2023, Ms. Prescott met with a representative of Dundee Concrete and Landscaping LLC (Dundee) to discuss a concrete curbing bid for one of LT's properties.  After the meeting, Dundee e-mailed her an estimate for the job.  Ms. Prescott sent Mr.

---

[1] We will identify a specific LT entity when relevant.  Otherwise, we refer to the LT entities collectively as "LT."

Lightner Dundee's bid and informed Dundee by e-mail that she forwarded the bid to the owners for approval. Mr. Lightner approved the bid. Ms. Prescott informed Dundee through e-mail that its curbing estimate was approved, and Dundee scheduled LT's request. Ms. Prescott acknowledged the scheduling but cancelled the bid a few days later because LT decided against a concrete curb.

Later, Ms. Prescott began e-mailing Dundee to ask for estimates for snow removal, sprinkler blowouts, and mowing services on behalf of LT Landscaping. LT Landscaping's practice was to outsource certain services and charge private owners a markup for coordinating with third-party vendors. In October, Ms. Prescott e-mailed Dundee a list of nine properties that needed snow removal services. Dundee sent her an estimate for the nine properties; she acknowledged receipt and indicated more properties might be added later. Some of these properties were owned by LT and some were privately owned. In late October, Ms. Prescott e-mailed Dundee a list of 52 additional properties. Ms. Prescott later requested estimates for 4 more properties.

In response, Dundee generated bids for all the requested properties. The bids were labeled "estimates," identified the property, and indicated the price per snow plow and snow blow based on the inches of accumulated snow. *See* CP at 496. Each estimate indicated that snow removal services started when snow accumulation reached one inch.

3

The bid also included deicing services that applied after any snow fall accumulation or plow.

In November, Ms. Prescott e-mailed Dundee a list of 63 "approved properties" for snow removal. CP at 642-46. A couple of weeks later, Ms. Prescott asked for bids for two more properties. Dundee correspondingly generated bids. At the end of November, Ms. Prescott removed 10 properties from the approved list.

Dundee began providing snow and ice removal services beginning November 30. Soon after, Ms. Prescott informed Dundee the owners of 7 of the properties did not want any more snow removal services. In all, Dundee provided snow and ice removal services for the approved properties from November 30 through December 4, December 10, 12, and 26. Dundee sent a total of 141 invoices to LT for the work it performed over those eight days.

On December 14, 2023, Ms. Prescott e-mailed the following message to Mr. Lightner and Mr. Towner: "Please accept this letter as a formal notification of my resignation from my position as the Landscaping Office Manager *at LT Real Estate*. My last day of work will be 12/28/2023." CP at 148 (emphasis added).

In early January 2024, Mr. Lightner e-mailed Dundee that "[Ms. Prescott] no longer works at LT" and LT would "get squared up on all of the properties you serviced."

CP at 822.  Mr. Lightner also informed Dundee that its snow removal services were no longer needed.  On January 17, 2024, LT paid Dundee for 59 of the 141 invoices, leaving 82 invoices unpaid.

Around this time, Todd Young contacted LT's accountant and complained about double charges he received from Dundee and LT.  Dundee had billed Mr. Young $1,590 for 7 invoices, whereas LT had billed him $3,950 for identical work.  LT's chief operating officer (COO) responded that he would reach out to Dundee about the work it did.  The COO resolved the complaint by charging Mr. Young for Dundee's services, but not for LT's "slight mark up for coordinating . . . 3rd party vendors."  CP at 96.[2]

In March 2024, Dundee, at LT's request, sent hundreds of before and after photographs of the snow and ice removal services it performed related to the unpaid invoices.  LT refused to make any further payments.

*Procedural history*

In July 2024, Dundee filed suit against LT Real Estate for breach of contract and unjust enrichment.  Seven weeks after Dundee filed suit, the owners of LT authorized the voluntary dissolution of LT Landscaping.  In December 2024, Dundee amended its complaint to include the other LT entities, including LT Landscaping LLC.

---

[2] A simple calculation shows that the "slight mark up" was 250 percent.

After the parties conducted discovery, Dundee moved for summary judgment and asked for the outstanding balance for the unpaid invoices, plus interest. Dundee contended summary judgment was appropriate for several reasons: Ms. Prescott had apparent authority to bind LT, LT should be estopped from arguing Ms. Prescott did not have authority to enter into contracts, LT ratified Ms. Prescott's actions, and, if no valid contract was formed, then LT was unjustly enriched. In response, LT countered with several declarations.

Mr. Young declared he was charged for snow and ice removal services on December 17 and December 24 and stated there was no snow on those days.[3] He also complained that one of Dundee's concrete suppliers had filed a claim of lien against one of his properties for work it had not performed, and it took an unnecessary amount of effort to resolve the problem and get the lien released.[4]

Ms. Prescott declared she frequently obtained estimates from third-party vendors and, when she did, she forwarded them to Mr. Lightner, Mr. Towner, or the owners of the property LT Landscaping was servicing. If the estimates were approved, Ms. Prescott

---

[3] Later, at the summary judgment hearing, LT conceded that Dundee had not sent any invoices for snow or ice removal for December 17 and December 24.

[4] Mr. Young's complaint has nothing to do with snow and ice removal or about any fact of consequence between the parties on appeal. It is irrelevant.

6

communicated the decision to the vendor/subcontractor. Ms. Prescott stated that she informed Dundee she was simply conveying the decisions of the LT owners or the property owners regarding a specific bid, estimate, or invoice. Ms. Prescott also declared she informed Dundee that it needed to send pictures of the property's condition before and after it performed its work or the invoices would be rejected.

Mr. Lightner declared that he and Mr. Towner were the only individuals at the LT entities with authority to execute contracts and had not delegated that authority to Ms. Prescott. Nor had they informed anyone at Dundee that Ms. Prescott had the authority to bind any LT entity. Mr. Lightner identified 74 of Dundee's invoices that lacked before and after photographs.

In reply, Dundee's owner, Steve Felchlin, declared that Ms. Prescott never mentioned the need for photographs before payment, although Dundee's standard practice was to take before and after photographs. Mr. Felchlin addressed the 74 invoices that Mr. Lightner claimed had no corresponding photographs. He explained that LT had already paid Dundee for 35 of those 74 invoices, that Dundee was not seeking payment for 33 of the other 74 invoices, and he provided before and after photographs of the remaining 6 invoices.

During argument at the summary judgment hearing, the trial court asked LT to clarify whether it was disputing the reasonableness of Dundee's charges. LT responded that it was not and explained that it was disputing the "frequency" of the invoices. Report of Proceedings at 26. The trial court granted Dundee's summary judgment motion and awarded Dundee $38,915.54, plus interest.

LT appealed to this court.

ANALYSIS

*Standard of Review*

We review summary judgment orders de novo and perform the same inquiry as the trial court. *Borton & Sons, Inc. v. Burbank Props., LLC*, 196 Wn.2d 199, 205, 471 P.3d 871 (2020). We consider all facts and reasonable inferences in a light most favorable to the nonmoving party, here, the LT entities. *Galassi v. Lowe's Home Ctrs., LLC*, 4 Wn.3d 425, 434, 565 P.3d 116 (2025).

Summary judgment is appropriate when there are no disputed genuine material facts and the prevailing party is entitled to judgment as a matter of law. CR 56(c). "A material fact is one that affects the outcome of the litigation." *Owen v. Burlington N. Santa Fe R.R.*, 153 Wn.2d 780, 789, 108 P.3d 1220 (2005). A material fact issue is genuine if the evidence allows a reasonable jury to return a verdict for the nonmoving

8

party. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). If Dundee meets its initial burden and shows there are no disputed material facts, LT must then identify specific disputed facts indicating a genuine issue for trial. *See* CR 56(e). LT may not rely on mere allegations. CR 56(e). Nor may LT rely on speculation or argumentative assertions that unresolved factual issues remain. *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). We may sustain a trial court's ruling on any correct ground. *Mohr v. Grantham*, 172 Wn.2d 844, 860 n.7, 262 P.3d 490 (2011).

A.      APPROVAL BY LT

LT challenges the trial court's determination that Ms. Prescott had authority to contract on behalf of one or more LT entities for snow and ice removal. We conclude that she had implied actual authority to do so.

*Ms. Prescott's authority*

LT may be bound by Ms. Prescott's actions if she had actual or apparent authority to contract. *King v. Riveland*, 125 Wn.2d 500, 507, 886 P.2d 160 (1994). Both actual and apparent authority rely on the principal's objective manifestations. *Id.* Actual authority may be express or implied. *Id.* "[I]mplied actual authority is found in those instances where the agent has consistently exercised some power not expressly given to

9

the agent[,] and the principal, knowing of the same and making no objection, has tacitly sanctioned continuation of the practice." *Id.*

The principal's manifestations to a third person create apparent authority if the manifestations lead the third person to subjectively believe the agent has authority to act for the principal and the manifestations would lead a reasonable person to conclude an actor is the principal's agent. *T-Mobile USA, Inc. v. Selective Ins. Co. of Am.*, 194 Wn.2d 413, 421, 450 P.3d 150 (2019). A principal may manifest apparent authority by appointing someone to a position with generally recognized duties. *King*, 125 Wn.2d at 507-08. Moreover, a principal is bound by the actions of their agent if the agent is placed in a position where reasonable people, who are familiar with business usages and customs, believe the agent has certain authority and act on that belief. *Hoglund v. Meeks*, 139 Wn. App. 854, 867, 170 P.3d 37 (2007) (quoting *Mohr v. Sun Life Assur. Co. of Can.*, 198 Wash. 602, 603-04, 89 P.2d 504 (1939)). However, a party cannot claim that an agent had broad authority if the party knew of a limitation of the agent's authority. *Lamb v. Gen. Assocs., Inc.*, 60 Wn.2d 623, 627-28, 374 P.2d 677 (1962).

Here, nothing in Ms. Prescott's e-mail communications with Dundee limited her role in LT to LT Landscaping LLC. All of her e-mail communications included her title as "Landscaping Office Manager," and contained the letters "LT" in large print under her

headshot.  CP at 45.  We infer that Ms. Prescott and the LT owners e-mailed each other regularly,[5] and the owners knew and tacitly approved of Ms. Prescott's representations to its vendors/subcontractors of her job title and her role with LT.

While a reasonable person would assume that a landscaping manager would have broad authority to contract with a vendor/subcontractor for landscaping services such as snow and ice removal, for purposes of summary judgment, Dundee knew that Ms. Prescott was required to obtain approval of its bids.

We conclude that Ms. Prescott had implied actual authority to bind the LT entities to a landscaping contract but only if the contract was properly approved.

*LT's approval*

Ms. Prescott e-mailed Dundee several times and requested bids for snow removal for numerous properties.  Dundee generated the bids and sent them to Ms. Prescott.  Ms. Prescott declared it was her practice to forward these bids to Mr. Lightner, Mr. Towner, or the owners of the property LT Landscaping was servicing.  If they approved the bid, Ms. Prescott would communicate their decision to the subcontractor or vendor.

---

[5] Ms. Prescott even transmitted her "formal notification" of resignation to the owners by e-mail, in which she referred to herself as "the Landscaping Office Manager at LT Real Estate."  CP at 148.

Importantly, Ms. Prescott declared that she "always" informed the subcontractor or vendor that she had spoken to the owners, and they had decided to accept or reject the bid. CP at 167. Ms. Prescott subsequently e-mailed Dundee and provided an "approved" list of properties who wanted Dundee's services. CP at 642-46. We conclude that Dundee offered to provide snow and ice removal services, and LT objectively accepted Dundee's offer.

B.     CONTRACTS WERE FORMED AND BREACHED

In a breach of contract action, the first question we must answer is whether the parties created an enforceable contract. LT argues it did not form a contract with Dundee. We disagree.

To form a contract, both parties must objectively manifest assent to the terms of a proposed contract. *P.E. Sys., LLC v. CPI Corp.*, 176 Wn.2d 198, 207, 289 P.3d 638 (2012). "Generally, manifestations of mutual assent will be expressed by an offer and acceptance." *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 178, 94 P.3d 945 (2004). Mutual assent is usually a question of fact for the fact finder. *P.E. Sys.*, 176 Wn.2d at 207. However, a question of fact can be "determined as a matter of law if reasonable minds could not differ." *Id.*

12

An invitation to bid is not an offer to contract but a solicitation for an offer. *Peerless Food Prods., Inc. v. State*, 119 Wn.2d 584, 595, 835 P.2d 1012 (1992). The contractor's bid is the offer to contract. *Hadaller v. Port of Chehalis*, 97 Wn. App. 750, 755, 986 P.2d 836 (1999). To form an enforceable contract, the offer must be communicated to the other party. *Farrell v. Neilson*, 43 Wn.2d 647, 650, 263 P.2d 264 (1953). Parties form a legally binding contract when one submits a written bid and the other accepts. *Modern Builders, Inc. of Tacoma v. Manke*, 27 Wn. App. 86, 93, 615 P.2d 1332 (1980).

LT argues it did not form a contract with Dundee because Dundee failed to prove (1) its estimates were delivered, (2) the estimates were mutually accepted, and (3) even if they were accepted, the estimates lacked essential terms. We address each argument separately.

### 1. Delivered/Communicated

LT first argues that Dundee did not prove that it delivered the bids. While LT correctly contends that an offer must be communicated to the offeree before it can serve as the basis for a valid contract, the undisputed facts imply that Ms. Prescott received the bids. Ms. Prescott expressly acknowledged she received nine bids. Dundee generated the bids on or near the day she requested them. Although Dundee did not provide

explicit evidence that it sent the rest of the bids to Ms. Prescott, Ms. Prescott

subsequently provided Dundee a list of approved properties that matched her requests and

Dundee's bids.  The undisputed facts therefore imply that Ms. Prescott received the bids.

LT also argues that Dundee did not provide proof that its bids were accepted

because none of the bids were signed.  However, the law only requires an objective

manifestation of assent, and LT provides no authority that requires a bid to be signed

before it is deemed accepted.

### 2. Sufficiently Definite

LT argues that even if LT accepted Dundee's offer, the terms were so indefinite

that they did not form a contract.  LT, citing *Cordell v. Regan*, 23 Wn. App. 739, 598

P.2d 416 (1979), argues that Dundee's estimates are better viewed as internal rate

proposals or preliminary contracts, not binding contracts.

In *Cordell*, the contractor submitted a "cost breakdown" sheet to a bank so the

homeowners could obtain a loan.  *Id.* at 740.  The contractor entered into a separate oral

agreement with the defendants that the price of the construction would be cost plus 10

percent.  *Id.* at 741.  *Cordell* does not stand for the proposition that "cost breakdown"

sheets generally do not create binding contracts, but rather that it did not create a binding

contract specifically in *Cordell*. Dundee's accepted estimates were not sent to a bank nor were they accompanied by a separate oral agreement.

LT also contends the terms were indefinite because none of Dundee's estimates included a start or end date, frequency of service, description of scope of service, or a total agreed price.

Contract terms must be sufficiently definite. *P.E. Sys.*,176 Wn.2d at 207. "[I]f a term is so 'indefinite that a court cannot decide just what it means, and fix exactly the legal liability of the parties,' there cannot be an enforceable agreement." *Keystone*, 152 Wn.2d at 178 (quoting *Sandeman v. Sayres*, 50 Wn.2d 539, 541, 314 P.2d 428 (1957)).

The bids Dundee provided expressly explained that Dundee would perform snow removal when there was at least one inch of snow accumulation, would perform ice removal after every plow and after any accumulation of snow, included the rate for plowing, blowing, and deicing, identified what areas would be serviced, and identified the property addresses where the services would be performed. From the bids, we can identify when Dundee was legally required to provide services, the scope of services, and the location of the services. We can also determine LT's legal obligation to pay based on each service Dundee provided. The terms of the bids were not indefinite.

### 3. *Mutually Accepted*

LT argues that because properties were continually being removed and added from the scope of work, there never was a mutual acceptance. Essentially, LT argues that there was no enforceable contract because the terms of Dundee's offer and its acceptance never mirrored each other.

When a party accepts an offer, the acceptance must match the offer exactly; otherwise, there is no meeting of the minds and no contract. *Sea-Van Invs. Assocs. v. Hamilton*, 125 Wn.2d 120, 126, 881 P.2d 1035 (1994). Generally, an acceptance that materially changes the terms of the offer acts as a counteroffer and does not form a contract. *Id*. What constitutes a material term depends on the particular facts of a given case. *Id*.

LT's arguments imply there was one contract. However, when we view the bids, it is more accurate to understand each bid as its own individual contract. Therefore, Ms. Prescott's actions of adding and removing properties from the approved list is inconsequential to the validity of the other contracts.

We conclude that Dundee and LT objectively manifested mutual assent to contract, and the terms were sufficiently definite to establish their legal liability. The

parties formed several independent contracts. Therefore, LT breached the contracts when it refused to pay Dundee for some of its snow and ice removal services.

C. DAMAGES

Since we have determined that LT breached the contracts, we must review the trial court's award of damages to Dundee. The trial court granted Dundee the full amount of its unpaid invoices plus interest. Although raised in its unjust enrichment section, LT argues that disputed material facts remain regarding Dundee's performance, and it contends the trial court inappropriately granted Dundee its requested damages.

LT argues that Dundee breached the contract by not providing before and after photographs, and therefore LT is excused from paying Dundee. But only a material breach relieves the other party of their corresponding duty to perform. *DC Farms, LLC v. Conagra Foods Lamb Weston, Inc.*, 179 Wn. App. 205, 220, 317 P.3d 543 (2014). Some factors we consider in determining the materiality of a breach are (1) the extent to which the deprived party (LT) did not receive the benefit it reasonably expected, (2) the extent the deprived party (LT) can be adequately compensated for the lost benefit, (3) the extent the nonperforming party (Dundee) will suffer a forfeiture, and (4) the likelihood that the nonperforming party (Dundee) will cure its breach. *Id*. at 221.

Here, Dundee provided LT with snow and ice removal services, LT received the expected benefit of the contract and if we require compliance with the purported photograph requirement, Dundee would suffer a forfeiture on those contracts not supported by before and after photographs. Importantly, here, Dundee actually cured its nonperformance by providing before and after photographs to support every invoice on which it sought to recover. These factors strongly suggest that Dundee's failure to provide before and after photographs when it first issued its invoices to LT was not a material breach.

Aside from the *DC Farms* factors discussed in the paragraph above, we note the uncontested fact that LT paid several of Dundee's invoices without obtaining before and after photographs. Although "materiality" of a breach generally is a question of fact, we can decide such questions if a reasonable trier of fact could come to only one conclusion. Here, no reasonable trier of fact could find that Dundee's failure to provide before and after photographs when it first issued its invoices to LT was a material breach.

LT contends disputed material facts remain regarding Dundee's performance of the challenged invoices. But Dundee addressed all of the challenged invoices in its summary judgment reply. Of the 74 challenged invoices, Dundee explained that it was not seeking payment for 33, LT had already paid 35, and Dundee submitted before and

after photographs for the remaining 6. A general assertion that disputed issues of material fact remain is insufficient to defeat summary judgment. *See SentinelC3, Inc. v. Hunt*, 181 Wn.2d 127, 140, 331 P.3d 40 (2014).

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____          _____
Cooney, A.C.J.                                           Murphy, J.